I'm ready to call our first case, SB Liquidation Trust versus Preferred Bank. May it please the Court, I'm Michael Yoder, appearing on behalf of Appellant SB Liquidation Trust. I'd like to reserve three minutes for rebuttal. All right. The undisputed economic reality of the transactions at issue is that the debtors incurred obligations to Preferred Bank and Co-Lin received the cash. All parties, including Preferred Bank, understood this to be the end game. Of course- Hold on just a second. When you say all parties, including Preferred Bank, knew this to be the case, what's the this that you say Preferred Bank knew? That the cash advanced to Syntax Brillian Company and Syntax Group Corporation would be subsequently and simultaneously advanced to Co-Lin. And why does that strike you as nefarious? Because that's said throughout your briefing, that they knew this cash was going to go to Co-Lin and the implication you want us to draw is that that's a bad thing. In and of itself, Your Honor, I don't think there is anything wrong with that. And I think, in fact, in many circumstances, there's absolutely nothing wrong with borrowing money for the benefit of the third party. Here, however, the case is very different because of the surrounding circumstances. The surrounding circumstances for fraudulent transfer claims being the debtor's intent and for purposes of the aiding and abetting claims being Preferred Bank's additional knowledge. For purposes of the debtor's intent, which is all that matters for purposes of the actual intent, fraudulent transfer claim, the statutory text is clear that the debtor's intent is all that matters. The case law is clear that the debtor's intent is all that matters. And let me press you on that. When you say it's clear that that's all that matters, you're suggesting that for a fraud claim, the mindset of the person you're accusing of fraud is irrelevant? No, Your Honor. I'm suggesting for purposes of an actual intent fraudulent transfer claim, not a common law fraud claim. For purposes of an actual intent fraudulent transfer claim. And, again, the intent is hinder, delay, or defraud. It's not actual fraud. It's just that's kind of the common parlance for the claim. The debtor's intent is what matters. Now, where the defendant's knowledge matters is for purposes of their good faith defense. Well, we'll get into that in a minute, but I really am interested in pursuing this with you for a minute. My colleagues will indulge me. You're accusing these folks of effectively being party to wrongdoing, wrongdoing which amounts to fraud, although, as you've noted, it could be hinder or delay. But your allegations are all about fraud. And yet your assertion is it doesn't matter what they knew or didn't know. Have I got your position correct? With one caveat, Your Honor. For purposes of the prima facie claim for the fraudulent transfer claim, their knowledge is irrelevant. Where their knowledge matters, which is a very important caveat, is for purposes of their good faith to claim. So the way it works – You're confusing me. I hope I don't go off track here. But doesn't this all depend upon collapsing the transactions into one? No, Your Honor, it doesn't. And the reason – Why did the bankruptcy court say that the plaintiff's claims rest upon collapsing the transactions? It's our belief that the bankruptcy court erred in that conclusion, Your Honor. Actual intent is to be inferred from all circumstances. When you're looking at the intent in borrowing money, you have to look – So this whole business about collapsing the transactions is a red herring? No, Your Honor. It's an alternative theory to the extent that a court is not allowed to look beyond the intent in borrowing money with the use of the proceeds. That was your theory, right? Yes. I mean, that's the theory you pressed on the bankruptcy court, correct? It's a theory and an alternative. We are very explicit in the briefing below that we say that actual intent is established regardless of collapsing. And the alternative – Why would you worry about collapsing the transactions if it's that clear? Because it's an alternative theory, Your Honor. To the extent – I don't understand. Why would you press an alternative theory that's irrelevant? It's not irrelevant. Collapsing is highly relevant. If the court were to decide that in ascertaining debtor's intent, in incurring an obligation, you're not allowed to look beyond the actual fact that money was transferred to SBC's bank account. Our position is a debtor doesn't borrow money to just stick it in their bank account. When you're ascertaining all of the surrounding circumstances, as has long been the case in fraudulent transfer law, you need to look at how they're intended to use the proceeds. Now, where collapsing comes in is if for some reason the court disagrees, that you can look at the subsequent use of the proceeds in ascertaining the intent of a borrowing. That's where collapsing comes in. Because then what collapsing would do, it would shift the focus from the intent in incurring the obligation to the intent in making the transfer. So it kind of shifts the focus to the co-lend faction's intent, which is the debtor's intent for purposes of the fraudulent transfer claim in advancing the money to co-lend. And you don't believe you have to have actual or constructive knowledge of the fraud before you're allowed to collapse, right? Correct. I think that is an open question. You have to have knowledge of what went on, but you don't have to necessarily know that. In our belief, knowledge of the economic reality, knowledge of the total structure of the transaction should be enough. This is consistent with the policy balance struck by Congress in enacting the fraudulent transfer laws, in which protection of the debtors is the primary focus. Now, innocent transferees certainly have protection through the good faith defense. So the Second Circuit got it wrong in HPE leasing? That isn't really what they said, though, is it? No, the Second Circuit was applying, and I apologize for delving way into the weeds on bankruptcy law, but the Second Circuit is dealing with the Uniform Fraudulent Conveyance Act as enacted through the New York Debtor and Creditor Law. Now, there's a very important difference between the New York Debtor and Creditor Act and the Uniform Fraudulent Transfer Act and the Bankruptcy Code, which is what is at issue here. The difference is the claims at issue there, the plaintiff had a burden of disproving good faith as part of their affirmative prima facie claim. We don't have that burden. The trust is pleading claims under the Bankruptcy Code and under the UFTA that has fundamentally different decisions, and it's the clear legislative intent of Congress in going to that different statutory scheme to make the transferee's intent irrelevant for the prima facie claim. Now, hold on. You say it's their clear intent. Help me out. What do you point to to say it's clearly Congress's intent to make the mindset of the people, and now we're talking in the context of collapsing, right? If I haven't followed your argument in response to Judge Van Antwerpen's question, you're saying HPE, that doesn't matter. They were applying New York law in the context of whether there had to be knowledge or not, and we're talking in the context of your collapsing theory, right? Correct. Okay. So how do you get around Tabor Court Realty, our precedent where, and I'm not sure what the voiced alpine, I'm not quite sure how you say that case's name, where the language seems to say you do have to have knowledge on the part of that third party in order to put them on the hook in a collapse transaction? Your Honor, I think that the key question there is knowledge of what? Our position is that if you have knowledge of the underlying substance of the transaction, which I think is clearly established by our pleadings, especially drawing all the inferences in our favor at the pleading stage, that every party here, including Prefer Bank, knew that the money was going to Colin. So the question then becomes why should you treat the transaction as something different when everyone knows that as a transaction? Now, to the extent – Well, everybody may know that the money is going to Colin, but people don't know that there is some sort of bad thing happening. Maybe the best way to have you do this is to respond to this from page 51 of your opponent's brief. They say, given that every transaction discussed in the complaint in the proposed First Amendment complaint was scrutinized by the debtor's internal accountants, formally audited by the debtor's external auditors, disclosed publicly in multiple files with the SEC, and diligence by the take-out lender Silverpoint without any discovery, quote-unquote, of the fraud, the bankruptcy court was clear-clicked in finding that the plaintiff's failure to allege facts which suggested inquiry by the bank would have actually disclosed fraudulent scheme to the bank was also fatal to the plaintiff's claims. Okay. I read that pretty fast. Sorry. But I'm sure you've thought about that. If everybody's involved with this, including Silverpoint, who certainly had an interest in knowing whether there's something bad going on, doesn't perceive there's something bad going on, how is it that you can say from the pleadings of your complaint, ah, Preferred Bank knew what was going on? First of all, Your Honor, the discussion of our complaint completely ignores pages 121 to 133 of the record, which is the entire discussion of the Cohen secured line. None of those transactions were disclosed. These transactions were approved outside of the normal credit facility, without the knowledge of the CFO. These are purely to prop up the balance of Cohen's accounts at the end of each year. And there are many other irregularities that other parties don't know. And the other huge issue with that is that is a factual finding as to what matters outside of the pleadings as to what these other parties did or did not know. Sure, the court can take judicial notice of what is disclosed, but to take a step beyond that and say, okay, I'm going to find that these parties must have known that, in and of itself is error. And the third point, Your Honor, is that a bank such as Preferred Bank is in a unique position to see information that the other parties dealing with this company at a 30,000-foot level would not. Specifically, Preferred Bank is providing trust receipt financing. They are seeing on a shipment-by-shipment basis more money is going to Cohen than SBC is back. They are seeing on a transfer-by-transfer basis. Your theory is that it was their responsibility to understand what the cost structure was of the manufacturing going on by Cohen and therefore understand there was under-cost selling going on? I'm not saying they should have. I'm saying we allege that they actually do have that knowledge. Well, give me an Iqbal Twombly something to hang my hat on if I were to agree with you. What do you have, other than a conclusory allegation that they knew, that shows they knew? I would direct the Court's attention to paragraphs 85 and 87 of our initial complaint, that entire discussion from pages 83 to 87 in the record. Now, those discussions of what Preferred Bank knew are summaries of all the underlying circumstances. We allege in some detail how amendment after amendment after amendment takes place because the trust receipt financing limit is going up. And the reason, as we allege in paragraph 66 to 69 of our complaint, is on each individual transaction, they're not making the sale. The only way it goes up is because Preferred Bank is seeing that – let me back up a step. So the way trust receipt financing works is the debtor can't actually pay for the product. So when the product gets shipped over from Taiwan to L.A., they incur an obligation to the bank. That obligation to the bank is secured by the underlying collateral. So they're seeing on a note-by-note basis that the collateral is not being repaid. They have a whole bunch of notes that are refinanced. They amend the credit facility numerous times and, in fact, intentionally refinance all this bad debt because they know it's bad debt. Well, there's sort of a feeling here. Is this some kind of a deepening insolvency claim that you kept lending to us and so it's your fault that we got deeper and deeper in debt? If you hadn't been so bad to lend to us, we couldn't have gotten this far in the red. Is that the gist of the complaint? No, Your Honor. I don't think we're saying the debt itself is where the harm comes in. The harm comes from the subsequent use of those proceeds and the integrated transactions of making matters worse. And, again, I think the deepening insolvency for purposes of the fraudulent transfer claims isn't really relevant at all. I see that I'm out of time. Are there any other questions? First of all, what law applies to the aiding and abetting Delaware or California? And as part of that, I've never heard of a situation involving conflict of laws where the law of two different forums seems to apply. Maybe that's a new one on me, but what's the story? The Court didn't really address that. I think California law applies under the most significant context test that it generally applies to Delaware law for choice of law purposes. Here, all the underlying conduct. Is there a party for applying the law from two different forums? Well, I think where it comes in is the California law applies to the actual aiding and abetting claim itself, and the Delaware law applies to whether or not there is a breach. So whether or not you knew of actionable conduct is determined by California law, whether or not there is actionable conduct is determined by Delaware law. It is somewhat of a strange circumstance. One other thing. You now claim that, in reality, California law does permit aiding and abetting claims against a bank or a fiduciary. Did you waive that by not raising it below? We raised it below, Your Honor. Yeah, in your 60B motion. But prior to that, you didn't really raise it, did you? Not really, Your Honor. But our 60B, our amended complaint is properly before the Court, and it is subject to date of review, as we indicate in our briefing. Okay. Anything else? All right. We'll have you back on rebuttal, Mr. Yoder. Mr. Martin. Can you just get set up here, Your Honors? Can I ask him the context question? Sure. Where are you on the ‑‑ if you'll pardon me for interrupting. This is a long, convoluted matter. What law do you feel applies to the aiding and abetting Delaware, California? Well, thank you for asking, Judge Van Antwerpen. My name is Craig Martin, and I represent Preferred Bank. My apologies for jumping. Yeah, no problem. I'm happy to answer your questions. We have argued in our briefing that Delaware law applies based on the fact that it is a matter of internal affairs that fiduciary duties is governed by Delaware law because these are Delaware corporations, and that in order to aid and abet that, you have to look to Delaware law. In addressing that, counsel for Preferred Bank ‑‑ California would have an interest there, though. They would, certainly. And our alternate position is that it doesn't really matter too much, because if you look to California law, you then find the financial code provisions that the bankruptcy court relied on to determine that the bank could not have liability for aiding and abetting without pleading actual or constructive knowledge. That may not be a correct statement of the law, though it may have been way if it's not. Did they cite authority that that's not always the situation? They cited some authority that they say is not always the situation. We don't disagree with the fact that if properly pled, there could be an aiding and abetting case. Our position is that the financial code protects the bank from aiding and abetting unless you can plead the type of knowledge that's required from any of the other causes of action. Is it in if they get their 60B, what they want in their 60B? Is it in then? Is it before the court then? Is it not waived? I don't believe that in the 60B motion, that issue was discussed from my new briefing. I could be wrong as well. I'd have to look closer at the briefing on that. But, again, the takeaway point from my standpoint is that it doesn't matter which law you apply because if you apply California law, then you have the Chase and Case and the Casey case, which is cited in the briefing. If you apply Delaware law, they've cited a case called Hospitals of Delaware, where in footnote 27, the vice chancellor there states that aiding and abetting a breach of fiduciary duty is governed by Delaware law and is similar to civil conspiracy and incites some judgment. Defer to my colleagues there. They've got a lot of other things. Right. I hope I have answered your question. You have, sir. Thank you. I'm happy to continue answering questions or proceed with my prepared statement. Well, if you don't mind, why don't you go to the point that we were asking Mr. Yoder about, and that is sort of what I take it is the trust's first line of argument, which is you don't have to worry about collapsing. You don't have to worry about knowledge. Knowledge is irrelevant. Only the debtor's knowledge is what matters here. Right. My response to that would be is that that is an argument that under 548A, the bankruptcy code says that if a debtor transfers assets with the actual intent to hinder, delay, or defraud, that the trust can avoid that transfer. That's certainly what the statute says. They pled that in one place in their complaint, in the actual paragraph dealing with the count. In all other places where they plead in their complaint, actual intent, they plead the actual intent of the colon faction. They don't actually plead the intent of the debtor. So they've made a leap in arguments in their briefing that the colon faction's intent is equal to the debtor's intent. But if you look at the actual pleadings in the complaint, they also talk about innocent decision makers who are unaware of what was happening, and they talk about in January of 2008, after a merger, that there was an independent board member appointed, Mr. Rayburn, from FTI Consulting, and that he had no knowledge of this going on. So I'm not sure that under Iqbal and Twombly, they've actually satisfied the pleading standard that the debtor's intent here was to commit the fraud. Well, if they've pleaded that the chairman of Syntax and inside officers, controlling officers of SBC, intended to do these things, then does it matter that there are other corporate officers who didn't know it? Well, I think it does on the face of these pleadings. I think they, on page 16 of their reply brief, cite to several cases where they talk about that corporations don't have intent, only their officers and directors do. They cite to these cases that talk about the intent of officers and directors. But from my review of those cases, all of the officers and directors were involved in the fraud. Here, on the face of the pleadings, they're drawing a line between the colon faction and the innocent decision makers, they call them. Go ahead. Go ahead. That's a new one on me. I'm not aware of any law, and maybe you could cite it to me, where you have to have all the potential agents of a corporation on the same page in order to have the corporation bound by what happens. I mean, if you've got controlling agents of the corporation whose intent is to do bad things, and they have alleged that about the so-called colon faction, why isn't that enough to say, under the bankruptcy code, this is the debtor intended to defraud? Let me respond to that in two ways. First is, I'm not necessarily disagreeing with you. I'm talking about this complaint, where in a situation such as this, they talk about innocent decision makers. But you're going back down the rabbit hole. I don't understand. Even if they talked about innocent decision makers until the cows come home, if they've talked about culpable decision makers, why isn't that enough to establish the kind of intent to hinder, delay, or defraud which is sufficient under the code? Well, Your Honor, I think you then go into the question that Judge Finansky asked about collapsing. Why? The obligation between the debtor and the bank to borrow money under loan documents doesn't on its face express an intent to defraud. There are more steps in that transaction according to their allegations. You're saying that collapsing is essential here. Yes. I'm suggesting that in order for essentially what HBE leasing says is, is that when you have an apparent first step in a series of transactions that's valid on its face, wouldn't normally be actually fraudulent, wouldn't normally be constructively fraudulent. It's a matter of equity. A court can look at that and say, well, there are other steps in this transaction, and if collapsed together, I can find that intent. Well, then, point out the flaw in their theory because they're saying, if I understand the briefing in Mr. Yoder's argument, they're saying, sure, we put collapsing out there as an alternative, but it's only an alternative. Under the bankruptcy code, it's enough for us to plead that the debtor had an intent to hinder, delay, or defraud, and we have pled that through the bad actions of the coal infraction, so you don't have to get to collapsing the transaction for the purposes of those pieces of our complaint. What's wrong with that assertion about how the code works? The flaw in that argument is that when a bank loans money to a corporation and actually gives money and takes a lien in exchange, there's nothing inherent in that transaction that happens every day. In order to get to the point where that transaction becomes actually fraudulent, there has to be additional intent in the debtor's mind that leads to that, and the way you get there is through collapsing. Why? Because you've got to get to the other transaction, the transaction, the second transaction. What they do with the money is the way they're perpetrating the fraud, I take it. Yes, and the Tabor decision that this court decided in the 1980s essentially says, in that case, there's a footnote that talks about the lender not knowing when it loaned the money to the company that it was going to be used to pay the dividends, and so without that knowledge it may not be liable. And HBE leasing then relies on Tabor for its statement that in order to take what is apparently an otherwise valid transfer between a bank and a borrower, you have to find this heightened knowledge level, actual knowledge or constructive level. Of what? Of the fraud. The fraud? Didn't we just say you had to know about the transactions? Well, the use of the money that's being lent is going to be used for improper purposes. Knowledge of the actual scheme, some courts say. We didn't really say that either. We just said you had to know about the transactions, didn't we, as I recall. Well, I don't remember exactly what you said in Tabor, and I apologize for that, Your Honor, but both the First Circuit and the Fourth Circuit and HBE leasing rely on that theory. This comes up a lot, strangely, in tax cases where there's an enabling statute under the tax code that says if there's a transfer that can be collapsed. And you have to plead, excuse me, but you have to plead ahead of time. You kind of have to establish fraud. You're saying you have to establish fraud ahead of time before you can collapse to go on and establish fraud. Isn't that kind of putting the cart before the horse? I'm not intending to put the cart before the horse. I'm talking in the context of Iqbal and Twombly. There has to be plausible facts that are alleged in the complaint that let the bankruptcy court reach a determination that it's more likely than not that the plaintiffs could recover on their action. Right. And what I'm saying then on top of that is that applying HBE leasing, there is a level of pleading that is required that the defendant. If we decide to file the Second Circuit. Yes. Tabard is the binding authority on us at this point. I would submit yes, and I would submit that HBE leasing followed Tabard and even cited it. They quoted from it, but they really quoted from the wrong part in Tabard, didn't they? They were quoting from an area where we were talking about something else, weren't they? I don't know the case well enough to be able to argue that point with you, but my view is that the Second Circuit relied on that and created this standard that courts follow all across the country in tax, bankruptcy. So assume you're right about the collapsing piece, and I apologize for having to circle back because I'm struggling a little bit to understand the party's positions on 548, okay? Okay. If I understand the trust's position correctly, that's their first approach, and their first approach is forget about collapsing. You don't even have to get to that. 548 is plain on its face. If the debtor has an intent to hinder, delay, or defraud, then that's enough to avoid the transaction. Now, they can speak for themselves, but am I articulating their position the way you understand it to be? Yes. Okay. If that's true, just assume for the sake of discussion for a moment that that's true, do you agree that that would make collapsing irrelevant? Because the intent of the debtor here is alleged to be to delay, hinder, defraud, through the actions of senior officers of SBC and Syntax before it. I have a hard time conceding that. I can understand why you're asking the question the way you're asking it, and I think my response would be that in that situation, there's a Rule 9 standard of pleading which requires greater specificity, and that simply pleading in the cause of action that the debtor's intent was to actually hinder, delay, or defraud is insufficient under Rule 9 and Twombly. Well, there's – okay. And what Judge Shannon found here in the bankruptcy court – sorry, what the bankruptcy court found is that based on the complaint as pled and items in the record that he could take judicial notice of, there was not a plausible basis to allege that the bank should be liable for an actually fraudulent transfer. Well, that's – and that's the question I guess I'm having the hardest time with. It strikes me that it's a hard thing to say that the bank is on the hook here. What does it mean to avoid a transaction in this context? I think what they would say it means is that the obligations were never valid, and so that when we were repaid those obligations, we received money that we shouldn't get to keep. I've actually been asking myself that question for several days, is what happens if they succeed. As Your Honor pointed out, Silverpoint, it's pled in the complaint, Silverpoint came in and took out those obligations and presumably thought that they were valid obligations when they took out the prior lender. So I don't know what happens if you say that those obligations were invalid in the first place because then we don't have valid obligations, and so the obligations that Silverpoint created also wouldn't be valid, and so now you have kind of this tripping chain of invalidating transfers all the way to – I don't know where that gets you. And you'd be required to repay the principal and interest payment you received? Under Section 550, they've pled that we would be able to, but as Mr. Yoder pointed out, in 548 there's a good faith defense that if we could prove that we acted in good faith and for value, we would have a lien on that to secure ourselves so we would potentially net that out and we wouldn't have to pay anything back. And what would – how would, as a practical matter, how would Silverpoint figure into this? If Silverpoint comes in, a third party, no allegations of wrongdoing or involvement by them in any form or fashion, they become the lender. Correct. What's the fallout to them if suddenly you guys are on the hook? Anything? I see my time is up, but I'm happy to answer that question. You know, to be honest with you, I've had a hard time answering that question. I don't know if you reverse today and you send this back down. We never answered the complaint. We haven't asserted counterclaims. You know, I don't know where the case goes from here and what their involvement is. I can tell you that they are on the oversight board for the trust and have a financial interest in the outcome of the lawsuit, so I suspect that that would be vigorously contested and there would be lots of issues with that. But it's a very hard question. Okay. Thanks very much, Mr. Marks. Thank you. Again, the statute is in word and the debtor's intent. Debtors here are corporations. Corporations can only act through persons. The Kolin faction here are alleged to be persons. I'm still perplexed. I mean, if it was that simple, why did you have this alternative collapsing theory? Because it is an unusual circumstance in which money advanced by a bank goes directly to our bank account. If the money had gone straight to Kolin, there wouldn't even be this potential argument. Collapsing is really a way of kind of, again, as an alternative, the extent that a court is putting on the blinders and not willing to look at all the surrounding circumstances and ascertaining intent, then collapsing comes into play. Is that a fair statement to say the court is putting on blinders? I mean, it looks like the court here struggled mightily to figure out what exactly you guys were, how you got to a claim that preferred bank is on the hook. And it seems, you know, fundamentally, I'll confess freely, I'm not a bankruptcy code expert, but it seems passing strange to me that you've got a claim for what amounts to fraud against somebody who you say has, you know, that their intent is actually irrelevant. You know, you say 548, what they know doesn't make any difference at all. Now make them give us a bunch of money. How does that work? It's where the affirmative defense comes in, Your Honor. And essentially, it's a balance that was struck in the structure of the code where the avoidance is from the debtor's perspective and the debtor's perspective alone. Once a transfer or an obligation is avoided, then the defendant has the burden, assert their good faith defense, and that is the protection. Now it is a balance that has been struck by the legislature to structure the code that way, and the UFTA is structured the same way. All the courts that have looked at this issue pretty much as we cited in our brief have come to that conclusion. Judge Shannon is a very, very knowledgeable and thoughtful bankruptcy judge. How did he get it in his mind that this was a case all about collapsing? How was it argued to him that left him thinking this is all about collapsing? I guess I'm asking you to be Carnac the Magnificent a little bit, but how did we get to the point where all of the discussion below seems to be about collapsing? I'm not really sure, Your Honor, because in our brief, we specifically raise the argument before we even get to collapsing, here's the reasons why we should win before you get to collapsing, in our brief on the motion to dismiss. And again, I think fundamentally Judge Shannon did not draw all the inferences in our favor. This is at the pleading stage. We've alleged pages after pages of pages supporting all of the- So what he is trying to recover by this lawsuit, the monies that were paid to the bank and to avoid these obligations? Yes, if we succeed in avoiding the obligations, then the recovery would be the amount of the obligations. And again, it's important to focus on just a few of the transactions that are really at issue. We're not contesting all the obligations on the four-party factoring arrangement for purposes of the appeal. It's the colon secured line and the other lump sum payments that were made outside of the regular credit agreement in the normal process. How much money are we talking about here? I think there's $31 million in December 2006, $15 million in September 2007, and roughly $28 million for the colon secured line described in pages 121 and 133 of the appendix. And the way you see this working out is you should be able to argue, even if the bankruptcy court is correct about the collapsing piece, you should be able to go back and say, hey, under 548 we alleged bad action by the colon insiders. Now let us proceed with that as an avoidance, and if they want to come forward with a good faith defense, it's on them to come forward and do that. Is that your pitch? Have I got it right? That's part one of our pitch. Part two of our pitch is even if you do collapse, regardless of which standard you apply, I think we've pled sufficient facts that should give rise to constructive notice. Now we think the better view, for all the reasons articulated in our brief, and the view that's more consistent with the set transaction doctrine, which really is focused on the economic reality, not on the fraudulent nature, as we point out in our reply brief. And that 60B would not be without any effect at all. It would help you prove all that, right? The 60B is primarily focused on the debtor's intent. I think the inferences when drawn in our favor are sufficient to give rise to actual intent to hinder, delay, or defraud in the first complaint. The amended complaint certainly draws the lines much clearer, and as a result of the new evidence, making our understanding of the fraud seem much, much, much worse. Okay. Thank you, Mr. Yoder. Appreciate the argument from both sides. We'll take the matter under advisement.